Argued and submitted June 4, 2013, affirmed on appeal and cross-appeal March 19, petition for review denied August 7, 2014 (355 Or 879)

SHERWOOD PARK BUSINESS CENTER, LLC,
an Oregon limited liability company,
*Plaintiff-Respondent*
*Cross-Respondent,*

*v.*

Brad TAGGART,
an individual,
*Defendant-Respondent*
*Cross-Appellant.*

BT OF SHERWOOD, LLC,
an Oregon limited liability company,
*Defendant-Appellant*
*Cross-Respondent,*

*and*

John BERMAN,
an individual,
*Defendant.*

BT OF SHERWOOD, LLC,
an Oregon limited liability company,
*Counterclaim Plaintiff-Appellant*
*Cross-Respondent,*

*and*

JOHN HOFFARD OF SHERWOOD LLC,
an Oregon limited liability company,
*Counterclaim Plaintiff,*

*v.*

Terry W. EMMERT,
an individual;
Keith Jehnke, an individual;
and Sherwood Park Business Center, LLC,
an Oregon limited liability company,
*Counterclaim Defendants-Respondents*
*Cross-Respondents.*

Washington County Circuit Court
C08554CV; A148908 (Control), A148927

323 P3d 551

John M. Berman argued the cause and filed the briefs for appellant-cross-respondent.

John M. Berman argued the cause and filed the briefs for respondent-cross-appellant.

George W. Kelly argued the cause and filed the briefs for respondents-cross-respondents.

Before Ortega, Presiding Judge, and Hadlock, Judge, and Norby, Judge pro tempore.

HADLOCK, J.

## HADLOCK, J.

This case arises out of a series of transactions in which a member of Sherwood Park Business Center, LLC (SPBC), Brad Taggart, attempted to transfer his interest in that company to BT of Sherwood, LLC (BT). Taggart later transferred interests in BT to attorney John Berman.[1] As a result, by the end of July 2008, BT was wholly owned by Berman; BT, in turn, purported to own a 25 percent interest in SPBC. Eventually, SPBC brought this action requesting, among other things, that the court expel Taggart from SPBC, declare invalid Taggart's attempted transfer of his interest in SPBC to BT, declare that BT had no interest in SPBC, and unwind the transactions between Taggart and BT. BT brought counterclaims against SPBC as well as claims against two of its members—Terry Emmert and Keith Jehnke.[2] As relevant here, BT asserted that Emmert and Jehnke owed it a fiduciary obligation and had breached that obligation. SPBC, Emmert, and Jehnke then responded with additional claims of their own.[3] After a bench trial, the court made findings of fact and conclusions of law and, ultimately, entered a general judgment declaring that Taggart's attempted transfer of his interest in SPBC to BT was null and void, expelling Taggart from SPBC effective January 1, 2008, permitting Emmert and Jehnke to purchase Taggart's 25 percent interest in SPBC, and declaring that defendants were not entitled to distributions or allocations of profits or losses of SPBC since 2008. As to BT's contention that Emmert and Jehnke had breached their fiduciary obligations to BT, the court concluded that Emmert or Jehnke owed no fiduciary obligation to BT and that, even if they had such an obligation, they did not breach it. It

---

[1] In this case, BT, Taggart, and Berman were named as defendants. However, the trial court dismissed the claims against Berman and those claims are not at issue on appeal. Indeed, of the originally listed defendants, only BT and Taggart are parties to the appeal. Accordingly, references to "defendants" throughout this opinion are to BT and Taggart.

[2] John Hoffard of Sherwood LLC, also brought claims against SPBC, Emmert, and Jehnke. Those claims were dismissed with prejudice and are not at issue on appeal.

[3] Although Emmert and Jehnke were originally brought into the case as third-party defendants (later designated as counterclaim defendants), for the sake of convenience, we will refer to SPBC, Jehnke, and Emmert collectively as "plaintiffs."

dismissed all the remaining claims and counterclaims with prejudice.[4]

On appeal, defendants challenge the trial court's judgment. In particular, they challenge (1) the trial court's ruling that Taggart's transfer to BT is void; (2) the court's expulsion of Taggart effective January 1, 2008; and (3) the court's determination that Emmert and Jehnke did not have a fiduciary obligation or, if they did, that they did not breach that obligation. In addition, on cross-appeal, Taggart asserts that, even if the court properly expelled him from SPBC, it improperly calculated the buyout amount for his 25 percent interest in SPBC. As explained below, we reject all of those challenges and affirm the trial court's judgment.

## I. LEGAL FRAMEWORK

Because the parties' dispute focuses on the law—both contractual and statutory—that governs various interests in SPBC, we describe the pertinent legal provisions in some detail. SPBC is a limited liability company that was formed in 1999 to develop a small office complex. Under ORS chapter 63, which relates to Oregon limited liability companies, and the company's operating agreement, the interests of SPBC's members in the LLC are not freely transferrable. Section 11 of the operating agreement governs the transfer of membership interests. Under Section 11.1(b), "[a] Member may not sell any portion of his or her member interest without first offering in writing to sell such interest to the other Members at a price to be determined by the offering Member." If the other members decide to purchase the interest, under Section 11.1(b)(1), they may complete the purchase by making a payment of twenty percent of the purchase price, with the balance of the purchase price payable "in sixty (60) equal monthly installments including interest at the prime rate *** plus 200 basis points, adjusted quarterly[.]"

---

[4] The judgment specifically provides:

"No parties are awarded money damages. All other claims, cross-claims, counterclaims, third-party claims, and counterclaims to third-party claims are hereby dismissed with prejudice. Any party seeking costs or attorney fees shall do so in accordance with ORCP 68."

A member may, however, assign his or her right to receive distributions without first obtaining the consent of the other members of the company under Section 11.2 of the operating agreement:

"Not withstanding Section 11.1, a Member may assign the Member's right to receive distributions under this Agreement without the consent of the other Members. Such assignment shall not constitute a transfer of an ownership interest in the Company and shall not divest the assignor of voting or other rights as a Member, other than the right to receive distributions."

Although members' interests—other than the right to receive distributions—are not freely transferrable, the SPBC operating agreement spells out circumstances in which a member may transfer his or her interest in the company without obtaining consent. As pertinent here, under Section 11.3(b), a member may "transfer the Member's ownership interest without being subject to Section 11.1" when the transfer is "to a trust or other entity controlled by the Member." Notwithstanding such a transfer to a member-controlled entity, however,

"[t]he transferee in a transfer described in this Section 11.3 shall be admitted as a substitute Member only as provided in Section 11.4 (but without regard to paragraph (b) thereof)."

Section 11.4, in turn, provides:

"No person or entity, other than a person or entity who already is a Member, who acquires a membership interest in the Company shall be admitted as a Member of the Company, unless and until:

"(a)  The requirements of Sections 11.1 or 11.3, in the opinion of counsel to the Company, are satisfied;

"(b)  In the case of a transfer described in Section 11.1, Members holding a majority of the percentage member interests in the Company (not counting the member interest of the transferor) consent to the admission of the transferee as a fully substituted member;

"(c)  The transferor and transferee execute and deliver to the Company the documents and instruments of conveyance necessary or appropriate, in the opinion of counsel

to the Company, to effect the transfer and to confirm the agreement of the transferee to be bound by the provisions of this Agreement; and

"(d)   The transferee furnishes to the Company the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the member interest transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information, statements or returns."

In sum, under the SPBC operating agreement, a member can transfer his or her interest in the company to another entity that the member controls, without first offering to sell the interest to the other members, but that entity will not become a member of SPBC until the conditions of Section 11.4 are satisfied. Additionally, under ORS 63.249(6),

"[a]ny otherwise permissible assignment of a membership interest shall be effective as to and binding on the limited liability company only after reasonable notice of and proof of the assignment have been provided to the managers of the limited liability company."

In addition to limiting how a membership interest may be transferred, the SPBC operating agreement also governs how membership interests may be terminated. First, Section 12.1 of the agreement provides that "[n]o Member shall withdraw from the Company without first obtaining the consent of all other Members." Section 12.3 outlines other events terminating membership. Section 12.5 provides that the purchase price upon an event terminating membership is the fair market value of the company multiplied by the member's ownership percentage. If there is no agreement regarding fair market value, then, under the agreement, the company must be valued by a third-party appraiser.

## II.   FACTUAL BACKGROUND

We note that defendants request that we exercise our discretion to review this case *de novo*. *See* ORS 19.415(3)(b) (describing discretionary *de novo* review). We decline to do so, as this is not an exceptional case where such review would be appropriate. *See* ORAP 5.40(8)(c) (court will review

record *de novo* "only in exceptional cases"). Accordingly, we state the facts consistently with the trial court's findings, supplemented with uncontroverted information from the record. *See Eagles Five, LLC v. Lawton,* 250 Or App 413, 416 n 2, 280 P3d 1017 (2012) (Explaining that, in cases where we do not conduct *de novo* review, "we review the trial court's legal conclusions for errors of law and are bound by the trial court's factual findings if they are supported by any evidence in the record").

After its formation in 1999, SPBC was initially managed by Taggart and had four original members— Taggart, Jehnke, John Hoffard, and Anthony Benthin.[5] In 2003, Emmert purchased Benthin's interest and became a member of SPBC.

To finance development of the office complex, SPBC borrowed money and, under the terms of the loans, each member of the LLC was required to sign a guarantee. In addition, each member was required to provide the lenders with annually updated financial information and, through 2004, each did so.

Late in 2004, Taggart began having financial difficulties and companies in which he was an owner or manager began to have cash flow problems. For at least one of those companies—Builder's, Inc.—Taggart diverted funds intended for payroll tax withholding to his own use. In early 2005, that company was placed in bankruptcy and Taggart disappeared for a period of time. Also in 2005, Taggart was removed as SPBC's manager and replaced by Jehnke.

In addition to diverting funds from Builder's, Inc., in late 2004 or early 2005, Taggart diverted approximately $30,000 from SPBC for his own purposes. SPBC initiated an arbitration proceeding; Taggart was represented by attorney Berman during that proceeding. Ultimately, the arbitrator concluded that Taggart had converted funds from

---

[5] SPBC is a "manager-managed limited liability company." *See* ORS 63.001(20) (providing that a manager-managed limited liability company is "a limited liability company that is designated as a manager-managed limited liability company in the limited liability company's articles of organization or whose articles of organization otherwise expressly provide that the limited liability company will be managed by a manager or managers").

SPBC and breached his fiduciary duty to that company. A judgment was entered in favor of SPBC and against Taggart in 2008. Eventually, Berman paid that judgment.

During 2006, 2007, and 2008, SPBC attempted to refinance its loans. Taggart refused repeatedly to produce the information required to complete those desired transactions. Had Taggart disclosed his financial information during that time period, the disclosure would have revealed that he was not solvent. Moreover, the bank with which SPBC was attempting to refinance would not lend the company money while litigation was pending between its principals. That litigation included, in addition to the arbitration proceeding, another case involving Emmert and Taggart that began in 2006. Accordingly, SPBC was unable to refinance the loans.

In mid-2007, Berman advised Taggart to form an LLC and transfer his interest in SPBC to that LLC. Berman told Taggart that he could then freely sell his interest in the newly formed LLC to a third party without complying with restrictions imposed by the SPBC operating agreement on transfers of membership interests in SPBC. Berman assisted Taggart in forming BT (the new LLC) in July 2007. Taggart held 100 percent of the membership interests in that LLC and transferred his entire interest in SPBC to the LLC as its sole asset. The document transferring Taggart's interest read as follows:

"TRANSFER OF MEMBERSHIP INTEREST"

"The undersigned Brad Taggart hereby conveys, transfers and assigns to BT of Sherwood, LLC all of his right, title and interest in and to Sherwood Park Business Center, LLC, an Oregon limited liability company, which interest is 25% of the issued and outstanding membership interests therein, in consideration for 100% of the membership interest of BT of Sherwood, LLC."

Berman then e-mailed SPBC's attorney and informed him that Taggart had transferred his interest in SPBC. He stated:

"Meanwhile, [Taggart] decided to put his interest in Sherwood Business Park, LLC into his own LLC. He transferred it to BT of Sherwood, LLC effective July 26, 2007.

That is a single member LLC and Brad Taggart is the only member.

"Please advise the LLC so that it can make any necessary changes on its books. Effective July 26, 2007 any K-1's should be to BT of Sherwood, LLC."

No documentation of the transfer was provided to SPBC at that time.

In late 2007, Berman took a security interest in Taggart's interest in BT to secure payment of his fees. Then, in December of that year, Berman agreed to purchase an interest in BT; he paid BT $100,000 and received a membership interest equal to 50 percent of what Taggart had and BT then immediately paid Taggart $100,000 in exchange for 50 percent of his existing interest in BT. As a result, Berman became half-owner of BT. In transactions in May and July of 2008, Berman acquired the remainder of Taggart's interest in BT for a total of an additional $100,000.[6] Berman and Taggart kept Berman's purchase of Taggart's interest in BT a secret until August 2008 and did not provide documentation of the transfer until the trial court ordered them to do so in the course of this litigation.

### III. PROCEEDINGS IN THE TRIAL COURT

SPBC filed this action in late 2008. Among other things, SPBC sought to have the trial court expel Taggart from SPBC, declare that Taggart's attempted transfer of his interest in SPBC to BT was invalid, declare that BT had no interest in SPBC, and unwind the transactions between Taggart and BT. For its part, as relevant on appeal, BT asserted that Emmert and Jehnke had breached their fiduciary duty to it.

Before the trial began, Taggart obtained a discharge of his debts in bankruptcy and filed a motion to dismiss the claims against him on the basis of that discharge. At the beginning of the trial, the court addressed that motion. The court noted that it was "not going to enter any money judgments against * * * Taggart, but I think there's some other

---

[6] Included in that $100,000 was approximately $33,000 that Berman paid to satisfy SPBC's judgment against Taggart (resulting from the arbitration relating to Taggart's diversion of funds from the company).

claims that involve him that don't involve money." Taggart asserted, however, that an "attempt to unwind anything *** would include *** Taggart's obligation to pay money back and that's *** a financial impact on him. I think the Bankruptcy Code says that pre-petition conduct cannot be relied upon to cause financial liability to [a discharged] person." Plaintiffs stated that they did not seek any monetary relief against Taggart, and that dismissal was not appropriate because "there is a nonmonetary claim for expulsion" and "Taggart needs to remain in the case for purposes of the expulsion claim." The court agreed:

> "I will not grant the motion to dismiss Mr. Taggart. Although I have already said and the other side has agreed that it's not a money judgment against him, but I think there are some technical claims that make him still technically a proper person in the lawsuit."[7]

The case then proceeded to trial. At the end of trial, after announcing its factual findings, the court discussed its legal conclusions. As to Taggart's membership in SPBC, the court ruled that it could be terminated, concluding that Taggart was "subject to expulsion under ORS 63.209."[8]

---

[7] We note that although, in his brief, Taggart purports to challenge the trial court's denial of his motion to dismiss based on the bankruptcy discharge, he has failed to develop any argument on appeal that actually relates to the bankruptcy discharge. Instead, to the extent that he argues that the trial court should have dismissed him from the case, that argument is based entirely on his contention that the court could not expel him from SPBC because he had already transferred his interest to BT. In the absence of any developed argument specific to the motion to dismiss that he filed in the trial court, we do not separately address the trial court's denial of that motion.

[8] ORS 63.209 provides, in pertinent part:

"(1) A member may be expelled from a limited liability company:

"(a) In accordance with a written provision in the articles of organization or any operating agreement; or

"(b) Except as otherwise provided in writing in the articles of organization or any operating agreement, by a court, upon application of any member, if the court determines that:

"(A) The member has been guilty of wrongful conduct that adversely and materially affects the business or affairs of the limited liability company; or

"(B) The member has willfully or persistently committed a material breach of the articles of organization or any operating agreement or otherwise breached a duty owed to the limited liability company or the other members to the extent that it is not reasonably practicable to carry on the business or affairs of the limited liability company with that member."

Noting that one way expulsion can occur under the statute is when "a member has been guilty of wrongful conduct that adversely and materially affects the business or affairs of the limited liability company," the court determined that Taggart's conversion of company funds was "sufficient to meet that criteria. Yes, it was repaid, but how can you trust somebody who steals [thousands of dollars] from your company. And it was repaid after litigation and a bunch of jumping through hoops[.]" Furthermore, the court concluded that Taggart was subject to expulsion for willfully or persistently committing a material breach of the articles of organization or operating agreement such that it was not "reasonably practicable to carry on the business or affairs of the limited liability company with" him as a member:

> "To me, this is very obvious that this applies. I won't belabor it, but [Taggart's] constant violations of the operating agreement by not cooperating with the banks and giving financial statements, disappearing for a long period of time, probably disappearing on purpose, quite frankly, not wanting to be talked to and just basically making himself unavailable to do business except on his terms."

For all of those reasons, the court concluded that it was appropriate to terminate Taggart's membership in SPBC.[9]

Moreover, the court determined that Taggart had not successfully transferred his SPBC membership interest to BT before that interest terminated:

> "It was permissible for Mr. Taggart to transfer his membership interest to BT of Sherwood if he had done it properly. While he was still a member, he could have transferred it, as he did, to BT of Sherwood as long as BT of Sherwood was an entity entirely controlled by a member."

_____

[9] The court also concluded, in the alternative, that Taggart's interest in SPBC could be terminated because,

"as a matter of law[,] *** Taggart withdrew as a member due to his action of selling all of his interest. This action was not approved by the other members. Section 12.3 of the Operating Agreement envisions things like this happening because it discusses unapproved withdrawals, and then it states that the other members may elect to purchase interest of the unapproved withdrawing member under section 12.5."

Because, as explained, we agree with the trial court's ruling that Taggart was subject to expulsion, we need not address that alternate basis for ruling that Taggart's interest could be terminated.

However, the court observed that, under ORS 63.249(6), such a transfer would be effective as to the limited liability company only after notice and proof of the transfer were provided to the managers of the company, and "[t]hat did not happen." According to the court,

"[u]ltimately, the proof of the assignment by Mr. Taggart of his SPBC membership interest to BT of Sherwood occurred after the litigation and by court order. At that point, BT Sherwood was not an entity controlled by a member of SPBC and therefore it was not an entity that could legally accept the transfer made from Taggart."

In the court's view, "they didn't do all the details right, so it never got done right." Accordingly, the court determined that the "purported transfer to BT of Sherwood violated the Operating Agreement and ORS 63.249(6)" and was not permissible.

As an alternative basis for its ruling, the trial court explained that—even if Taggart had successfully transferred his SPBC membership interest to BT—it disagreed with defendants' contention that Taggart could then transfer his interest in BT to any third party he wished. The court concluded that defendants' contention was incorrect given the provisions of the statutory scheme and the operating agreement which, in the court's view, was "designed to protect SPBC and its members from having to tolerate new members who are not of their choosing or liking." Thus, "[e]ven if BT of Sherwood had accepted a proper assignment of Taggart's interest in SPBC"—which the court had concluded it did not—"it could not transfer that interest to anyone else." Furthermore, the court concluded, "only members or assignees of members who have been approved by the membership can receive distributions of profits or losses from SPBC."

As to BT's claims against Emmert and Jehnke, the court concluded that there was no breach of fiduciary duty for two independent reasons: (1) as a matter of law, neither Emmert nor Jehnke owed fiduciary obligations to BT, and (2) even if they did owe a fiduciary duty, they did not breach it.

Based on those conclusions, as noted, the court entered a judgment in which it, among other things, (1) declared that Taggart's attempted transfer of his membership interest in SPBC was unauthorized and, accordingly, BT had no interest in SPBC; (2) expelled Taggart from SPBC, effective January 1, 2008, as a result of his wrongful conduct; (3) declared that defendants "were not members or authorized assignees of an existing member of [SPBC] in 2008, 2009, or the present" and, accordingly "they were and are not entitled to receive any distributions or allocations of profits or losses of [SPBC] since 2008"; and (4) concluded that Emmert and Jehnke were entitled to purchase Taggart's 25 percent interest in SPBC as follows:

"The purchase price shall be the fair market value of the Company as of the date of entry of Judgment multiplied by Taggart's 25% membership interest, less any unpaid post-bankruptcy petition attorney fees, costs and prevailing party fees which might be assessed against Taggart pursuant to ORCP 68 and ORS Chapter 20 and any necessary proceedings in bankruptcy court or this court.

"The fair market value shall be determined by a third-party appraiser acceptable to Jehnke, Emmert and Taggart. Within 90 days of the valuation, Jehnke and Emmert shall pay twenty percent of the purchase price as a downpayment, and the balance shall be paid in 60 substantially equal, consecutive monthly payments, including principal and interest. Interest shall accrue from the date of closing at the prime rate quoted by the Wells Fargo Bank at Portland, Oregon on the date that this Judgment is entered. Emmert and Jehnke may prepay some or all of the outstanding balance at any time without penalty or additional interest."

BT's claims relating to the asserted breach of fiduciary duty by Emmert and Jehnke were dismissed with prejudice. On appeal, defendants challenge the trial court's judgment.

## IV.  ANALYSIS

Defendants contend that the trial court erred in determining that Taggart's transfer of his interest in SPBC violated the operating agreement and Oregon law and, therefore, BT had no interest in SPBC. With respect to that issue,

defendants first assert that, although, under ORS 63.249(6), a transfer could not be effective as to or binding on SPBC until SPBC received "notice and proof of the transfer," SPBC did receive proof as required.[10] In particular, defendants assert that, when Berman e-mailed SPBC's attorney and notified him that Taggart had decided to transfer his interest in SPBC to BT, "a single member LLC" with Taggart as the only member, and asked the attorney to "advise the LLC so that it c[ould] make any necessary changes on its books," "that was 'proof'" of the transfer. Furthermore, they argue that a verbal statement by Taggart during a face-to-face meeting with Jehnke indicating that he had transferred his interest was also proof. Plaintiffs respond that defendants fail "to apply any meaningful distinction between 'notice' and 'proof.'" In their view, the trial court correctly ruled that "Taggart, acting through his attorney, Berman, gave notice of the transfer; 'proof' was not provided for another year and a half." We agree with plaintiffs.

To address whether SPBC was provided with proof of the transfer of Taggart's interest pursuant to ORS 63.249(6), we begin by considering the meaning of that term. *See State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009) (to determine legislative intent, we examine the text and context of relevant statutes, along with any helpful legislative history offered by the parties).[11] Although the terms "notice" and "proof" are not defined in ORS chapter 63, we begin by looking at their plain, ordinary meaning. *See State v. Briney*, 345 Or 505, 511, 200 P3d 550 (2008) (court gives words of common usage their plain, ordinary meaning). The dictionary defines the word "notice" as notification. *Webster's Third New Int'l Dictionary* 1544 (unabridged ed 2002). That is, by its plain meaning, notice is "formal or informal warn-

---

[10] We note that, in his brief, Taggart also asserts that ORS 63.249(6) does not apply because the operating agreement "does not contain any requirement that SPBC be provided proof of the transfer before the transfer is effective." We reject that contention without published discussion except to note that the provisions of ORS 63.249 apply "[e]xcept as provided in the articles of organization or any operating agreement" and the operating agreement here does not include provisions that either conflict with ORS 63.249(6) or disclaim that statute's applicability.

[11] Our review of the statute's legislative history has revealed no information that we find helpful in the resolution of this issue.

ing or intimation [about] something." *Id.* Similarly, *Black's Law Dictionary* 1164 (9th ed 2009) defines notice as "[l]egal notification required by law or agreement." In contrast, the word "proof" refers to "[t]he establishment or refutation of an alleged fact by evidence." *Id.* at 1334; *see Webster's* at 1816 (proof is "the cogency of evidence or of demonstrated relationship that compels acceptance by the mind of a truth or a fact" or "something that induces certainty or establishes validity"). In other words, by its plain text, the term "notice" in ORS 63.249(6) refers to notification of a fact, while "proof" refers to evidence of that fact. Thus, on its face, ORS 63.249(6) contemplates that, for an "otherwise permissible assignment of a membership interest" to be "effective as to and binding on" the LLC, the company must be given both reasonable notification of the assignment and evidence to establish that the assignment has occurred.

Here, based on those definitions, along with the trial court's factual findings, SPBC was clearly given notice of Taggart's transfer of his interest to BT. Both communications that defendants point to—the e-mail from Berman and the statement by Taggart during the meeting—met the minimal standard that SPBC be notified (that is, be *told*) of the transfer. However, as discussed, the statute requires more than that. Under ORS 63.249(6), *both* notice *and* proof were required for the assignment to be effective as to SPBC. And, contrary to defendants' contention, the communications in question did not provide SPBC with evidence to establish that the transfer had occurred. Indeed, as defendants acknowledge, the "notice" requirement is less demanding than the "proof" requirement. The informal communications were insufficient to satisfy the more rigorous requirement that defendants provide proof of the assignment to SPBC. Accordingly, we conclude that the trial court correctly determined that, although defendants provided notice of the transfer in 2007, proof of the assignment by Taggart of his SPBC membership interest to BT was not provided until after this litigation began.

We next consider the trial court's analysis of the legal significance of that absence of proof. In that regard, the trial court found that, by the time SPBC received proof of the attempted transfer from Taggart to BT, BT was owned

by Berman rather than Taggart. From that fact, the court concluded that the attempted transfer was not valid. We agree.

Again, under the terms of the operating agreement, a member "may not sell any portion of his or her member interest without first offering in writing to sell such interest to the other Members at a price to be determined by the offering Member." A member may, under Section 11.2 of the operating agreement, "assign the Member's right to receive distributions *** without the consent of the other Members." Such an assignment does not "divest the assignor of voting or other rights as a Member, other than the right to receive distributions." Under Section 11.3 of the agreement, a member may also transfer his or her interest to an "entity controlled by the Member." When a member transfers his or her interest to a controlled entity, that entity may be admitted as a substitute member where it meets the requirements set forth in the operating agreement.[12]

Here, the trial court's finding that Taggart attempted to transfer to BT his membership interest in SPBC (as opposed to merely the right to receive distributions from the company) is supported by the evidence. As noted, in a document entitled "TRANSFER OF MEMBERSHIP INTEREST," Taggart purported to transfer "all of his right, title and interest in and to Sherwood Park Business Center, LLC, an Oregon limited liability company, which interest is 25% of the issued and outstanding membership interests therein." Although the operating agreement would have generally prevented Taggart from transferring his membership interest in SPBC without first offering it to other members, Taggart could permissibly have transferred his interest to

---

[12] Those requirements are that (a) the requirements for a transfer to a controlled entity "in the opinion of counsel to the Company, are satisfied;" (b) "[t]he transferor and transferee execute and deliver to the Company the documents and instruments of conveyance necessary or appropriate, in the opinion of counsel to the Company, to effect the transfer and to confirm the agreement of the transferee to be bound" by the operating agreement; and (c) the transferee provide "to the Company the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the member interest transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information, statements or returns."

BT as an entity he controlled. Furthermore, Section 11.4 of the operating agreement provided an avenue (which Taggart did not utilize) by which BT could have become a substitute member in Taggart's place. However, as discussed above, under ORS 63.249(6), even an otherwise permissible transfer of Taggart's interest in SPBC would be "effective as to and binding on [SPBC] only after reasonable notice of and proof of the assignment" was provided. That is, until proof was provided, the assignment did not (1) become valid or operative, *see Webster's* at 724 (defining "effective" as "taking effect : VALID, OPERATIVE"); *Black's* at 592 (defining "effective" as "in operation"), or have legal force as to SPBC, *see Webster's* at 217 ("binding" means "imposing an obligation, duty, or responsibility," or "requiring submission"); *Black's* at 190 (defining "binding" as "having legal force").

Here, as discussed, Taggart failed to provide proof of the transfer of his interest in SPBC to BT until after the commencement of this litigation and, by the time proof was provided, BT was not an entity Taggart controlled. Instead, as the trial court observed, by the time proof of the transfer was provided, all of Taggart's interest in BT had been sold to Berman. Thus, by the time that the attempted transfer could have been valid, operative, or have legal force as to SPBC, BT was not an entity to which Taggart's interest could be transferred absent a prior offer to sell to the other members of SPBC. In light of the foregoing, the trial court did not err in concluding that Taggart did not properly transfer his membership interest in SPBC to BT, and we reject defendants' challenge to that ruling.

In their final argument related to the import of ORS 63.249(6), defendants assert that, even if the communications from Taggart and his attorney did not constitute "proof" for purposes of that statute, that lack of proof should have no effect on the validity of the transfer "as between the parties to the transfer." Instead, defendants contend, "ORS 63.249(6) merely provides that an LLC does not have liability to a contrary claimant until it has 'proof' of the transfer." We observe, first, that this case is not concerned with the effect of the transfer as between only Taggart and BT. Rather, it relates to the validity of the transfer *as to SPBC*. Furthermore, we find no support in the statute for

the assertion that ORS 63.249(6) relates only to the LLC's "liability to a contrary claimant"; to the contrary, the statute provides that a transfer will not be "effective as to and binding on" the LLC until notice and proof have been given. Given that the transfer was not "effective as to" SPBC, because of the lack of proof, the transfer was not valid as between *SPBC*, Taggart, and BT.

We turn next to defendants' assertion that the trial court erred in concluding that Taggart was subject to expulsion pursuant to ORS 63.209. Again, pursuant to that provision, a member may be expelled from an LLC where the member is "guilty of wrongful conduct that adversely and materially affects the business or affairs of the limited liability company" or where the member "has willfully or persistently committed a material breach of the articles of organization or any operating agreement * * * to the extent that it is not reasonably practicable to carry on the business or affairs of the limited liability company with that member." ORS 63.209(1)(b)(A), (B). The court found that Taggart had stolen a large amount of money from SPBC, had intentionally failed to provide financial information, and had made himself unavailable to carry on the business. Accordingly, the court concluded, Taggart was subject to expulsion under both ORS 63.209(1)(b)(A) and (B). Based on that conclusion, the court expelled Taggart effective January 1, 2008.

On appeal, defendants do not challenge the trial court's findings regarding Taggart's conduct nor do they assert that those findings do not provide a proper basis for expulsion from an LLC. Instead, defendants contend that Taggart could not be expelled from SPBC because he had already transferred his interest to BT.[13] However, as we have explained above, Taggart's purported transfer of his interest to BT had no validity or legal force as to SPBC because no proof of the transfer was provided while BT remained

---

[13] We observe that, in its brief, BT attempts to "incorporate[] by reference" legal argument set forth in a lengthy declaration attached as part of the excerpt of record. However, pursuant to ORAP 5.05(2), briefs must comply with a word count limitation (which does not include the excerpt of record) and attorneys are required to include, at the end of each brief, a certification that the brief complies with the word count limitation. Because the purported incorporation by reference of the legal argument contained in the declaration would effectively permit the brief to circumvent the requirements of the rule, it is inappropriate.

wholly owned by Taggart—the only period during which the transfer could be effective. Accordingly, there is no merit to defendants' contention that Taggart had no interest in SPBC at the time that the trial court expelled him from that company.[14] In short, the trial court did not err in expelling Taggart from SPBC.[15]

Our conclusions thus far obviate the need to address a number of defendants' remaining arguments. Specifically, defendants assert that "there were no restrictions on the change in control of BT" and, in their sixth, seventh, and eighth assignments of error, challenge the trial court's conclusions (1) that BT could not transfer the interest in SPBC that it had acquired from Taggart (2) that distributions and allocations of profits or losses in SPBC could be made only to members of SPBC or assignees approved by members, and (3) that neither Emmert nor Jehnke owed a fiduciary duty to BT and, even if one existed, they did not breach it. Defendants' assertions regarding all of those issues are dependent on BT having an interest in SPBC. Given that the trial court correctly concluded that Taggart's transfer of his interest in SPBC to BT was not effective or binding as to SPBC, we decline to address those contentions further.

Taggart contends on cross-appeal that, even if the trial court did not err in expelling him from SPBC, it erred in describing how Emmert and Jehnke could purchase his interest in SPBC. In that regard, the court ordered:

> "The purchase price shall be the fair market value of the Company as of the date of entry of Judgment multiplied by Taggart's 25% membership interest, less any unpaid post-bankruptcy petition attorney fees, costs and prevailing party fees which might be assessed against Taggart pursuant to ORCP 68 and ORS Chapter 20 and any necessary proceedings in bankruptcy court or this court.

---

[14] We observe that a mere assignment by Taggart of his right to receive distributions would not have deprived him of his membership in SPBC under Section 11.2 of the operating agreement. Further, under Section 12.1 of the operating agreement, Taggart could not properly withdraw from the company "without first obtaining the consent of all other Members."

[15] Based on that conclusion, we need not discuss defendants' challenge to the trial court's alternate ruling that Taggart's actions amounted to an unauthorized withdrawal from the LLC.

"The fair market value shall be determined by a third-party appraiser acceptable to Jehnke, Emmert and Taggart. Within 90 days of the valuation, Jehnke and Emmert shall pay twenty percent of the purchase price as a downpayment, and the balance shall be paid in 60 substantially equal, consecutive monthly payments including principal and interest. Interest shall accrue from the date of closing at the prime rate quoted by the Wells Fargo Bank at Portland, Oregon on the date that this Judgment is entered. Emmert and Jehnke may prepay some or all of the outstanding balance at any time without penalty or additional interest."

Pointing to Section 12.5 of the operating agreement, Taggart argues that the purchase price should be calculated based on SPBC's fair market value as of January 1, 2008—the date as of which the trial court declared that Taggart was expelled from the company—and that the interest rate should be the rate in effect on that date. For the reasons set out below, we disagree.

Under Section 12.3 of the operating agreement, upon the expulsion or withdrawal of a member, "the remaining Members, within 120 days thereafter, * * * may elect to purchase the interest of the affected Member pursuant to the provisions of Section 12.5." Section 12.5 of the agreement, in turn, provides:

"The purchase price for an interest purchased pursuant to Sections 12.2 or 12.3 shall be the fair market value of the Company valued by the transferring Member's ownership percentage. The fair market value of the Company shall be determined by agreement among the remaining Members and the transferring Member or his or her representative or successor. In the event agreement as to such value cannot be reached, the Company shall be valued by a third-party appraiser acceptable to both the remaining Members and the transferring Member or his or her representative or successor. Twenty percent (20%) of the purchase price shall be paid as a downpayment, and the balance shall be paid in sixty (60) substantially equal, consecutive monthly payments, including principal and interest. Interest shall accrue from the date of the election to purchase at the prime rate in effect on *the date of the event giving rise to the election to purchase* as quoted by Wells Fargo Bank at

Portland, Oregon, or, if such bank ceases to exist, as quoted by any comparable financial institution selected by the Manager. The closing shall not be later than ninety (90) days following the date of the election. The unpaid balance of the purchase price may be prepaid at any time without penalty."

(Emphasis added.)

In Taggart's view, the "event giving rise to the election to purchase" occurred on January 1, 2008—the date the court stated in the judgment that Taggart was deemed to have been expelled. Plaintiffs respond that the "event giving rise to the election" is the court's declaration that Taggart was expelled from SPBC (not Taggart's earlier acts that were the basis for the expulsion), which occurred at the time the judgment was entered. In their view, they could not elect to purchase Taggart's share of SPBC until the judgment was entered and, therefore, the entry of the judgment expelling Taggart should be considered the "date of the event giving rise to the election to purchase."

The issue raised by the parties' assertions is what date the operating agreement contemplates as the "date of the event giving rise to the election to purchase." We review the court's interpretation of the agreement for errors of law. *See Housing Authority of Jackson County v. Gates*, 246 Or App 521, 524, 267 P3d 169 (2011). Having reviewed the operating agreement, we conclude, based on the text of the pertinent provisions, in context, that the date from which interest is measured is the date that Jehnke and Emmert had a right to purchase Taggart's interest. *See Yogman v. Parrott*, 325 Or 358, 937 P2d 1019 (1997) (setting forth method of contract interpretation).

Again, Section 12.3 of the agreement gives Jehnke and Emmert the right to elect to purchase Taggart's interest in SPBC within 120 days of his expulsion. Section 12.5, in turn, provides that interest accrues "from the date of the election to purchase" and the interest is calculated based on the "date of the event giving rise to the election to purchase." Thus, the key date under the agreement is the date upon which the event occurs that gives members the right to purchase another member's interest. As noted, it is Taggart's

expulsion that gives rise to Emmert and Jehnke's right to purchase the membership interest in this case. Although, as Taggart observes, the trial court's declaration was that Taggart was expelled effective January 1, 2008, the expulsion did not occur automatically or by operation of law. Instead, it was the entry of the court's judgment that operated to expel Taggart from SPBC. Until the court entered the judgment, the other members of SPBC had no right to purchase Taggart's interest. Thus, based on the terms of the agreement, the date of the "event giving rise to the election to purchase" was the date of the judgment and the trial court did not err in ordering that the purchase price for Taggart's interest in SPBC be calculated with reference to that date.

Affirmed on appeal and cross-appeal.